**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| LYNSEY C.,[1]<br>*Plaintiff*, | : | 3:25CV973(RMS) |
| v. | : | |
| FRANK BISIGNANO COMMISSIONER OF SOCIAL SECURITY,<br>*Defendant*. | : | SEPTEMBER 29, 2026 |

**ORDER DENYING THE PLAINTIFF'S MOTION TO REVERSE AND GRANTING THE DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER**

This is an administrative appeal following the denial of the plaintiff's application for supplemental security income benefits ("SSI") under Title XVI of the Social Security Act (the "Act").[2] It is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

The plaintiff now moves for an order reversing the decision of the Commissioner of the Social Security Administration (the "Commissioner") and remanding the case for further administrative proceedings. (Doc. No. 21). The Commissioner, in turn, has moved for an order affirming the decision. (Doc No. 26). For the following reasons, the plaintiff's motion for an

---

[1] To protect the privacy interests of social security litigants while maintaining public access to judicial records, in opinions issued in cases filed pursuant to Section 205(g) of the Act, 42 U.S.C. § 405(g), this Court will identify and reference any non-government party solely by first name and last initial. See Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).

[2] The plaintiff's initial application included both an application for social security disability insurance ("SSDI") benefits and SSI benefits. Eligibility for SSDI is premised, in part, on a disabled claimant's "insured status" under the Act, *i.e*., payment into Social Security through employment income for a set period prior to application. *See* 42 U.S.C. §§ 423(a)(1)(a), (c)(1). "SSI payments are a form of public assistance unrelated to the recipient's earnings or employment" but also require a finding of disability. *Sykes v. Bank of Am.*, 723 F.3d 399, 405 (2d Cir. 2013). *See* 42 U.S.C. § 1382(a). Because the regulations are "virtually identical and do not differ materially," *Peterson v. Kijakazi*, No. 3:22-CV-00026 (VLB), 2023 WL 334379, at *5 n.7 (D. Conn. Jan. 20, 2023), the Court will cite to both types of cases in this decision.

order reversing or remanding the ALJ's decision is **DENIED**, and the Commissioner's motion for an order affirming that decision is **GRANTED**.

## I. PROCEDURAL HISTORY

In February 2022, the plaintiff applied for SSDI and SSI benefits. (Doc. No. 14, Certified Transcript of Administrative Proceedings, dated 08/12/2025 ["Tr."] 302–04). The plaintiff alleged her onset date was January 1, 2013. (Tr. 17, 302). The application was denied initially and upon reconsideration. (Tr. 173–74, 206–17, 225–32). On January 11, 2024, Administrative Law Judge ("ALJ") Matthew Kuperstein held a hearing during which the plaintiff and a vocational expert testified. (Tr. 48–90).

Shortly after the hearing, the plaintiff's counsel submitted a brief seeking to reopen a previous SSDI application that was denied in 2020.[3] (Tr. 330–31). Specifically, plaintiff's counsel stated, "The [plaintiff's] pending Title II application is an implied request to reopen ALJ Harrington's December 8, 2020, unfavorable decision." (Tr. 330). Counsel also requested to amend the claimant's alleged disability onset date to June 30, 2019, *i.e.*, the date the plaintiff was last insured. (Tr. 330–31).

On July 2, 2024, the ALJ issued an unfavorable decision denying the plaintiff SSDI and SSI benefits. (Tr. 14–39). The ALJ granted the plaintiff's request to amend the onset date to June 30, 2019. (Tr. 17). However, the ALJ denied the plaintiff's request to reopen her previous SSDI application on the ground that the plaintiff did not present new and material evidence that would

[3] The plaintiff previously applied for SSDI and SSI benefits on January 6, 2015, alleging an onset of disability on March 25, 2014. (Tr. 94). These applications were denied initially, on reconsideration, by ALJ Kuperstein on June 20, 2017 after a hearing, and, finally, on appeal dated August 9, 2018. (Tr. 94–117). On September 10, 2018, the plaintiff filed a second application for SSDI benefits, alleging an onset date of February 1, 2014. (Tr. 124). As with the first application, the second application was denied initially, on reconsideration, by ALJ I.K. Harrington on December 8, 2020 after a hearing, and on appeal dated July 15, 2021. (Tr. 124–48). Plaintiff's counsel sought to reopen this second SSDI application, but these previous applications are not otherwise relevant to this appeal before the district court.

have resulted in a different conclusion. (Tr. 18). The ALJ also found that the plaintiff was not entitled to SSDI on procedural grounds insofar as she was not eligible to receive SSDI benefits since her last insured date was June 30, 2019. He concluded the plaintiff was not entitled to SSI benefits on the substantive ground that she "has not been under a disability within the meaning of the Social Security Act" since her SSI application. (Tr. 20). The Appeals Council denied the plaintiff's request for review on April 30, 2025, thereby making the ALJ's decision the final decision of the Commissioner. (Tr. 1–4).

The plaintiff filed her complaint in this pending action—appealing only the SSI component of the decision—on June 19, 2025. (Doc. No. 1). The following month, the parties consented to the jurisdiction of a United States Magistrate Judge, and the case was transferred to the undersigned for all purposes. (Doc. No. 12). On November 24, 2025, the plaintiff filed her Motion to Reverse the Decision of the Commissioner with a memorandum of law. (Doc. No. 21). The Commissioner filed her Motion to Affirm and memorandum of law on February 6, 2026. (Doc. No. 26). The plaintiff did not file a reply.

## II. FACTUAL BACKGROUND

The Court presumes the parties' familiarity with the plaintiff's medical history, which is thoroughly discussed in the plaintiff's statement of material facts and which was adopted by the defendant. (*See* Doc. No. 21-1 at 3–13; Doc. No. 26-1 at 4). The Court cites only the portions of the record that are necessary to explain this decision.

### A. The Plaintiff's Hearing Testimony

On January 11, 2024, the plaintiff appeared for an in-person hearing before the ALJ. (Tr. 48–90). Her counsel, Gary Huebner, was present, and, after reviewing the recently submitted exhibits, it was confirmed that the record was complete. (Tr. 50–54).

The ALJ asked the plaintiff to testify about her work history. She testified that she worked as a phone operator for Yellow Cab Garage in 2010. (Tr. 76). In that capacity, the plaintiff answered the phone and took notes, which meant she was seated all day and did not have to carry anything. (*Id.*). In 2011, the plaintiff began working for Dunkin' Donuts where she did heavy lifting and cleaning during the night shift. (Tr. 59, 76–77). One year later, the plaintiff switched to the afternoon shift where she handled the register and made coffee. (Tr. 77). This job required her to stand or walk while working for the entirety of the six-hour shift except for her fifteen-minute break. (Tr. 78). Her physician at the time restricted her lifting and carrying to twenty pounds, and the heaviest object she lifted was a one-gallon milk carton. (*Id.*). The plaintiff became pregnant and, after her child was born in 2013, she worked at Dunkin' Donuts two days a week, two hours per day. (Tr. 59). She stopped working altogether in 2014, because her mental health struggles made it too difficult for her to leave the house. (*Id.*).

The ALJ elicited testimony about the plaintiff's physical limitations that would prevent her from working. The plaintiff testified that she struggled to walk and stand for long periods of time, and had "trouble sitting still" because the pressure on her back made her "legs go numb." (Tr. 60–61). She regularly used a cane, because her knees would "give out" and her balance was "really bad." (Tr. 63, 72). She also testified that she struggled to pick up items and would often drop them. (Tr. 67–68).[4]

---

[4] When the plaintiff testified about dropping objects, the ALJ stated: "I don't see anything in the record about that. But, I'll look more closely. I'll look to see if you're dropping things. But, once again, these complaints that you're telling me about, I need to know the limits. Once again, when you tell me about things that aren't in the record, I discount them. I say that's not consistent with what I'm seeing and I don't see any records on that. Once again, I'm not the one who decides that. We have doctors who have looked at your file already and they went over things and so forth. I'll look at what your doctors say too. But, just to push diagnoses, I know what the diagnosis is, it doesn't mean you can't work. There are a lot of people who have problems with their hands with neuropathy, with tendinitis, who knows, back pain, and they still work on a daily basis and you're telling me you can't. So, Counsel, go ahead with the limitations she has on a daily basis." (Tr. 68–69).

The plaintiff also discussed her headaches. They lasted from six hours to two days, and she often got one headache per week.[5] (Tr. 69). Sometimes, her headaches caused so much pain she had to go back to bed to "sleep it off." (Tr. 71). If she woke up and still had a headache, her children would have to cook dinner. (*Id.*).

As for mental health limitations, the plaintiff testified that her PTSD caused her to fear leaving her house because she might "get hurt" or encounter the person with whom she "had that past experience with." (Tr. 62). The plaintiff's depression and anxiety would get triggered with a "bad pain day," and this, in turn, would impact her sleep.[6] (Tr. 61). Two to three times per week, the plaintiff experienced panic attacks, which she described as "build[ing] into a puddle type of situation" where she would shut down and could not "hear the things around her." (Tr. 66–67). With respect to interacting with others, the plaintiff testified she had "trouble with crowds," struggled to answer the phone, used telehealth because she often left a waiting room if she was not called quickly, could not attend social events with friends or family, and could not attend her

[5] After the plaintiff testified about the duration of her headaches, the ALJ urged her counsel to focus on limitations rather than symptoms. When counsel argued that the frequency is relevant to limitations, the ALJ stated, "[Y]ou asked how frequently she's having them and asked her to go into further detail on the specific headaches. Once again, people have headaches for days and they work on a daily basis. Some of them do work as doctors and scientists and they have headaches all the time." (Tr. 70). Counsel argued that the frequency of headaches is relevant to her functional limitations. (*See id.*). The ALJ responded: "I'm just explaining to you what I'm looking for today. If you don't have questions about limitations from these impairments, then we can move on to the vocational expert. If you do, ask her about her limitations. Once, again, I'm not the one who is treating her. If you want to help her with regards to her treatment, you can maybe explain to her the importance of her telling all these things to her actual treating doctors because that might help her even more for proof of disability benefits because, once again, if she's having all these problems, she needs to make sure she's talking to her doctors about them fully." (Tr. 70–71).

[6] Counsel asked the plaintiff, "Why aren't you sleeping well? What are you experiencing[?]" (Tr. 65). Before the plaintiff answered, the ALJ stated: "Counsel, once again, I don't need to hear her symptoms. Hopefully, she told her doctors why she's not sleeping well. Hopefully, she's getting treatment for that from her doctors. If you have any questions for her about that [sic][what] prevent[s] her from functioning in a daily basis. Once again, I'm not here to treat her. I'm here to evaluate the limitations that she has from her impairments and that's consistent with the records." (Tr. 66).

children's school functions. (Tr. 60–61, 63–64). As an example, for an entire month, the plaintiff feared leaving her house because she was afraid of seeing a clown. (Tr. 62). Sometimes during a depressive episode, her children would see her "cry all day long." (Tr. 72).

The plaintiff also testified about her ability to complete household tasks. (Tr. 60). She stated that she relied on her son to cook and do dishes. (Tr. 72). Her house often fell in disarray due to her lack of motivation during depressive episodes. (*Id.*). Although the plaintiff was able to grocery shop, she could only go shopping at one particular store and refused to go unless her aunt accompanied her. (Tr. 60, 63). Sometimes the plaintiff experienced panic attacks at the grocery store. (Tr. 66–67). While the plaintiff always made sure her grocery list was "in the order in what the store [was] to make sure [she] can get in and out very quickly," sometimes she had to leave her list and wallet with her aunt and return to her car. (*Id.*). Because her neurologist told her not to lift more than ten pounds, she would not lift more than a jug of water at a time. (Tr. 60.).

**B. <u>The Vocational Expert's Hearing Testimony</u>**

The vocational expert, Lynn Paulson, first testified that the plaintiff's past jobs were identifiable as a phone operator performed at the sedentary level and a coffee shop attendant performed at the light level. (Tr. 79).

The ALJ presented several hypotheticals and asked the vocational expert to opine about the possible substantial gainful activity with the following assumptions: the hypothetical individual has the same past work experience as the plaintiff, has completed the twelfth grade, and "was [between] 25 and 36 years old."[7] (Tr. 80).

---

[7] The Court will discuss only the hypotheticals that apply to the ALJ's determination of the plaintiff's residual functional capacity ("RFC").

First, the ALJ asked the vocational expert to testify about available jobs if the hypothetical person had limitations of (1) lifting, carrying, pushing, or pulling twenty pounds occasionally and ten pounds frequently; (2) standing, walking, and/or sitting with normal breaks for six hours in an eight-hour workday; (3) crawling and climbing ramps or stairs frequently; (4) stooping, kneeling, and crouching occasionally; (5) never climbing ladders, ropes or scaffolds; (6) no concentrated exposure to vibration; (7) no exposure at all to hazards, moving mechanical parts, electrical, work "at high exposed places," or radiation; (8) simple work for two-hour periods; (9) occasional interaction with the general public; (10) no required collaboration or teamwork with others; and (11) only occasional, simple changes to a workplace setting. (Tr. 80–81). The vocational expert testified that a person in this circumstance could perform the jobs of "merchandise marker," "office helper," "inspector and hand packager." (Tr. 81). All of these jobs are classified as light exertion positions. (*Id.*).

Second, the ALJ added a limitation of "frequent handling, fingering or feeling bilaterally." (Tr. 81–82). The vocational expert testified that the available jobs would not change, because they were "all rated at frequent." (Tr. 82). When the ALJ added another limitation of "standing or walking with normal breaks for a total of four hours in an eight-hour workday" and required the individual to use "a cane for ambulation," the vocational expert testified that the hypothetical individual could still perform the jobs of "office helper" and "the inspect[or], hand pack[ag]er." (*Id.*).

Third, the ALJ added the following limitations: "lifting, carrying, pushing or pulling of ten pounds occasionally or was further limited to only occasional balancing, climbing of ramps or stairs or crawling. . . ." (*Id.*). The vocational expert testified that this hypothetical individual could perform the same jobs as the previous hypothetical individual. (*Id.*).

Fourth, the ALJ returned to the original hypothetical. Upon doing so, he added a limitation of "occasional handling, fingering or feeling bilaterally." (Tr. 84). The vocational expert testified that light exertional work could no longer be performed. (*Id.*). When the ALJ changed the limitation to "occasional handling, finger or feeling" with the dominant upper extremity, the vocational expert's testimony remained the same. (*Id.*). For the same limitation to the non-dominant upper extremity, the vocational expert testified that the hypothetical individual could perform the jobs of office helper and merchandise marker but not the jobs of inspector or hand packager. (*Id.*).

### C. <u>Medical Evidence</u>

The medical records contain evidence from several providers: Pequot Health Center, including Lawrence & Memorial Hospital from March 6, 2012 through September 13, 2021 (Tr. 672–981); Yale New Haven Health from August 9, 2016 through September 13, 2021 (Tr. 509–671); Community Health Center, Inc. from January 28, 2017 through December 27, 2023 (Tr. 437–508, 1041–89, 1172–1231, 1268–1417); Craig McKnight, M.D., on September 21, 2021 and October 3, 2022 (Tr. 982–92, 1032–40); Hartford Healthcare Bone and Joint Institute ("Bone and Joint Institute") on January 31, 2022 (Tr. 993–1011); In Focus Eyecare on February 17, 2022 (Tr. 1012–15); and David L. Tinklepaugh, M.D., of Hartford Healthcare's Ayer Neuroscience Institute ("Neuroscience Institute") from June 17, 2022 through November 28, 2022, and on February 23, 2023 (Tr. 1083–1171, 1090–02, 1267, 1418–29). Because the plaintiff filed her SSI application on February 8, 2022, the ALJ considered medical evidence up to twelve months preceding the application date "[i]n accordance with policy." (Tr. 18).

The ALJ determined the plaintiff had five severe impairments: "obesity, lumbar degenerative disc disease, an adjustment disorder, post-traumatic stress disorder, and a depressive

disorder." (Tr. 22). In addition, the ALJ determined the plaintiff had the following non-severe impairments: "asthma, fibromyalgia, bilateral neuropathy, carpal tunnel syndrome, restless leg syndrome, ulnar neuropathy, chronic pain, insomnia and chronic headaches[,] . . . 'high anxiety,' [and] agoraphobia." (*Id.*).

### 1. Mental Health Treatment

The plaintiff began mental health treatment with Community Health Center on September 14, 2014. (Tr. 1246). The record contains treatment notes from 2017, (Tr. 437–508), but the relevant treatment notes begin on August 11, 2022 and end on December 27, 2023. (Tr. 1041–89, 1172–1231, 1268–1417). During this time, the plaintiff had weekly or biweekly therapy sessions, each lasting 30 to 40 minutes, with Ms. Anderson from August 11, 2022 through February 16, 2023; with Dianna Rodriguez, L.C.S.W., from February 27 through May 9, 2023; and with Dorothy Hiralien, L.P.C., from May 30 through December 27, 2023. (*Id.*). Also, during this time, Sarah Hunt, A.P.R.N. treated the plaintiff for medication management, and these appointments took place every couple of months and lasted approximately ten to twenty minutes. (*Id.*). All appointments took place either telephonically or by video. (Tr. 1041–89, 1172–1231, 1268–1417). Regardless of the provider, the format of Community Health Center's therapy notes was similar. In relevant part, each therapist performed an assessment, wrote notes specific to the session, and documented the diagnoses.[8]

On August 11, 2022, Ms. Anderson diagnosed the plaintiff with agoraphobia, PTSD, and major depressive disorder, and these diagnoses remained the same throughout the entirety of their sessions together. (Tr. 1066–68, 1072–74, 1078–84, 1088, 1377–82, 1391–1412). Ms. Anderson's initial assessment indicated the plaintiff was "oriented to time, place, person"; had a

[8] While the treatment notes contain additional information, the Court focuses on these three components as they were the only aspects discussed in the ALJ's decision.

depressed mood; had normal speech and a thought process described as "Circumstantial, Intact"; had moderately impaired judgment and insight; did not have suicidal or homicidal ideation; experienced pain at a six; and was medication compliant. (*Id.*). This assessment never changed. At every session, Ms. Anderson noted the plaintiff had made "mild" progress towards her goals. (*Id.*). During Ms. Anderson's treatment of her, the plaintiff regularly complained about how symptoms of anxiety and/or depression impacted her quality of life, such as by preventing her from completing activities of daily living ("ADLs") and avoiding certain locations due to bad memories or past trauma. (*See, e.g.,* Tr. 1083, 1392). She often attributed increased anxiety and depression to "life stressors," including the denial of SSI, issues with her eldest child, and her relationship with her mother. (Tr. 1067, 1073, 1381, 1395, 1402, 1411).

During the time that Ms. Anderson treated the plaintiff, Nurse Hunt managed the plaintiff's medication. (Tr. 1069–71, 1085–87, 1388–90). Nurse Hunt diagnosed the plaintiff with PTSD and depression. (Tr. 1086). Her assessment indicated the plaintiff had a "cooperative" attitude, "good" attention, and a normal degree of awareness; was oriented to "time, place, person"; had an appropriate, full range affect with an anxious mood; had normal, clear speech; demonstrated good judgment and insight; had "unremarkable" thought content and "intact" thought process; and did not demonstrate suicidal or homicidal risks. (Tr. 1085–86). The assessment did not change during this time period. (Tr. 1069–71, 1085–87, 1388–90). During these sessions, Nurse Hunt noted: "She [continues] to avoid going out in public (especially alone) when possible due to intense anxiety." (*Id.*). The plaintiff also described feeling tired during the day but struggling to sleep at night. (Tr. 1069, 1085). Nurse Hunt did not change the plaintiff's medication. (Tr. 1069–71, 1085–87, 1388–90). However, on January 26, 2023, she noted: "Patient declines more aggressive

psychopharm despite residual symptoms, I have reviewed all of the medications and any problems or side effects patient may be experiencing." (Tr. 1389).

The plaintiff began therapy sessions with Dianna Rodriguez on February 27, 2023. (Tr. 1373–75). Ms. Rodriguez first diagnosed the plaintiff with only major depressive disorder, but she added a PTSD diagnosis in early April. (Tr. 1361). Ms. Rodriguez's assessment indicated the plaintiff was "oriented to time, place, person"; had a depressed and anxious mood; had normal speech and an in-tact thought process; had moderately impaired judgment and minimally impaired insight; did not have suicidal or homicidal ideation; experienced pain at a three due to chronic back pain; and was medication compliant. (Tr. 1374). As with Ms. Anderson, Ms. Rodriguez did not change the assessment for the duration of the sessions. (Tr. 1351–69, 1370–72). Ms. Rodriguez noted that the plaintiff complained about difficulty sleeping, family issues, back pain, physical therapy, fear, depression, and trauma symptoms. (*Id.*). In their last session, the plaintiff reported having "continued anxiety," "continued agoraphobia," and "apprehension from deviating from routine and 'safe' spaces." (Tr. 1353). But she also talked about enjoying a "recent visit with [a] friend who lives out of state." (*Id.*).

While being treated by Ms. Rodriguez, the plaintiff had two medication management appointments with Nurse Hunt. (Tr. 1348–50, 1367–69). Nurse Hunt's March 23, 2023 notes were materially the same as the previous session in January 2023. (*Compare* Tr. 1388–90 *to* Tr. 1367–69). On May 18, 2023, the plaintiff had an appointment with Nurse Hunt for the purpose of requesting a new therapist. (Tr. 1348–50). Nurse Hunt's assessment of the plaintiff was the same as with previous appointments with one exception: with respect to the plaintiff's mood, Nurse Hunt noted she was both anxious and dysthymic. (Tr. 1349). Nurse Hunt noted that the plaintiff had "a hard time in April" but that she "did not feel like she could open up" to Ms. Rodriguez.

The plaintiff stated that she had "high anxiety and some self harm (burning self with lighter)." (Tr. 1348). She added that the plaintiff's mood "has been anxious/low" and that she was "struggling with sleep which she relate[d] to her overall stress level being high." (Tr. 1348). As with previous sessions, the plaintiff reported the need "to avoid going out in public (especially alone) when possible due to intense anxiety." (Tr. 1348). She also continued to decline "more aggressive psychopharm despite residual symptoms." (Tr. 1349, 1368).

The plaintiff began treatment with Dorothy Hiralien on May 30, 2023, which lasted until December 27, 2023. (Tr. 1270–98, 1302–23, 1327–47). Like Nurse Hunt, Ms. Hiralien diagnosed the plaintiff with PTSD and major depressive disorder. (Tr. 1345). This diagnosis remained largely the same, although Ms. Hiralien included an agoraphobia diagnosis on October 6 and December 11, 2023.[9] (Tr. 1270–98, 1302–23, 1327–47). Ms. Hiralien's initial assessment indicated the plaintiff was "oriented to time, place, person"; had a euthymic mood, appropriate affect, and normal speech; had intact thought process, judgment, and insight; did not have suicidal or homicidal concerns; and was medication compliant. (Tr. 1345). Her assessment periodically changed with respect to the metrics of mood, affect, and pain. For mood, Ms. Hiralien typically indicated the plaintiff was "euthymic," but noted the plaintiff was "depressed" on October 13, December 11, and December 18, 2023. (Tr. 1274, 1278, 1302). She also generally identified the plaintiff's affect as "appropriate," with some exceptions: "Fatigued" on November 6; "Drowsy, Fatigued" on November 27; "Sad" on December 11; "Flat, Drowsy, Fatigued" on December 18; and "Fatigued" on December 27. (Tr. 1271, 1274, 1278, 1286, 1296). Lastly, Ms. Hiralien did not always note the plaintiff's pain, but when she did, the plaintiff's pain typically scored either

[9] The plaintiff had six sessions between October 6 and December 11 that did not include "agoraphobia." (*See* Tr. 1281–98, 1302–05).

zero or five with two exceptions: a score of eight on June 9 and a score of ten on December 11. (Tr. 1270–98, 1302–23, 1327–47).

Ms. Hiralien's notes indicate that the plaintiff regularly discussed anxiety and stress due to complicated relationships with her mother and other family members, (Tr. 1275, 1279, 1286, 1297, 1304, 1312, 1315, 1319, 1337, 1340, 1343), financial and housing instability, (Tr. 1275, 1279, 1283, 1328, 1334, 1337), and struggles with sleeping, (Tr. 1293, 1297, 1331, 1334). On June 16, 2023, the plaintiff shared that "she was able to handle being alone for her appt" and that she felt "a bit anxious, but was able to handle it." (Tr. 1340).

On August 11, 2023, the plaintiff reported that her "'depression [had] been really bad' and [that] she [had] been burning herself." (Tr. 1322). Ms. Hiralien's notes indicated: "[Client] reports she is depressed, but no intent or means for suicide. [Client] reports passive SI. [Client] shared that she has no motivation or energy to do anything. She is hoping to do something this evening." (Tr. 1322).

On September 15, 2023, the plaintiff described "feeling lonely"—including "when she realized she did not have anyone to have dinner with one night"—and having "crying spells." (Tr. 1315). The following week, the plaintiff reported that she would be going to a concert with her mother, stating "she is excited and nervous at the same time." (Tr. 1312).

In October 2023, the plaintiff reported feeling "depressed and unable to get out of bed at time," (Tr. 1308), and that she was "self-harming by burning herself." (Tr. 1304).

From November through December 2023, the plaintiff assisted her family in taking care of her step-grandmother in Brooklyn until she passed away, after which she and her relatives began to care for her grandfather, which caused her to leave her home and experience additional stress. (Tr. 1283, 1286, 1289, 1293, 1297). On December 11, the plaintiff reported, "I am severely

depressed" due to being overwhelmed from driving her aunt to her grandfather's house and not being able to afford gifts for her children, (Tr. 1283), but on December 27, the plaintiff reported "doing well" because she had a "good holiday and the kids were happy with their gifts." (Tr. 1279).

While being treated by Ms. Hiralien, the plaintiff had medication management appointments with Nurse Hunt on August 2 and October 18, 2023. (Tr. 1299–1300, 1324–24). Nurse Hunt's assessment of the plaintiff remained the same as her assessment on May 18, 2023. (*Compare* Tr. 1299–1300, 1324–24 *to* Tr. 1348–49). She also noted that the plaintiff continued to decline "more aggressive psychopharm despite residual symptoms." (Tr. 1300, 1325).

**2. Back and Upper Extremity Pain**

In 2020, the plaintiff visited Bilal Hameed, M.D., with complaints about numbness and pain "in the last 3 fingers of both hands for 6-7 years." (Tr. 521–23). Dr. Hameed ordered an electromyography ("EMG"), and the results were normal. (Tr. 518–23). On November 5, 2020, Dr. Hameed noted, "Recent EMG had been unremarkable and her and symptoms have not been significantly [ ] bothersome at this time and I would hold off on any further wu from that standpoint for now." (Tr. 517).

On January 31, 2022, the plaintiff established care with rheumatologist Anita Christina Chandrasekaran, M.D. (Tr 1002–11). The plaintiff complained that she felt "diffuse joint and muscle pain, with associated swelling" and that "her hands get hot and red." (Tr. 1002). She shared that she had been taking prednisone for two years after being diagnosed with "polymyalgia rheumatica" by her primary care physician. (Tr. 1008). Dr. Chandrasekaran determined she should taper off prednisone, noting: "It is inappropriate that she has been maintained on prednisone for 2 years, without further work-up." (Tr. 1008). After performing a musculoskeletal and general

examination, Dr. Chandrasekaran concluded that the plaintiff "appears to have a myofascial pain disorder/central pain sensitization." (Tr. 1008). They discussed fibromyalgia, which "is a real illness and is not imagined" and which is not a dangerous or deteriorating condition even though "this pain is very real." (*Id.*). Dr. Chandrasekaran informed the plaintiff about the importance of good sleep, stress reduction, exercise, and mood disorder treatment to decrease symptoms. (*Id.*). Dr. Chandrasekaran noted: "Reassured that symptoms will come and go. It was emphasized that the patient's pain may not fully resolve, but that the goal is to be functional with a manageable pain level. Will defer possible medication management to the patient's PCP and psychiatrist." (*Id.*).

On June 17, 2022, the plaintiff obtained an MRI of her pelvis without contrast. (Tr. 1098). The radiologist's impression was: "Normal sacroiliac joints without evidence of sacroiliitis. Small L5/S1 central inferior disc extrusion without canal or foraminal stenosis." (*Id.*).

On October 10, 2022, Dr. Tinklepaugh evaluated the plaintiff for "paresthesias in both hands and upper extremities." (Tr. 1121). The plaintiff complained that she "does feel her hands are weak at times and she drops objects [but] she has not noticed muscle loss." (*Id.*). The plaintiff also reported some neck pain and chronic lower back pain. (*Id.*). (Tr. 1120–10). Dr. Tinklepaugh reviewed the plaintiff's prior laboratory results, clinic notes from other providers, electrodiagnostic testing, clinical scales, and X-Ray reports. (Tr. 1129). Dr. Tinklepaugh examined the patient and noted:

> The patient has symptoms consistent with ongoing cubital tunnel syndrome. I recommended elbow pads bilaterally be worn at night. We will have her back for electrodiagnostic testing. I do not get strong evidence of cervical radiculopathy.
>
> She does not have typical polyneuropathy symptoms of the lower extremities her sensation is great except for some sensory changes in the L4 distribution along with an absent left patellar reflex suggestive of an L4 radiculopathy and will obtain imaging given that she feels weak when walking and has had more recently urinary

> incontinence. However[,] her strength is excellent. We will also obtain electrodiagnostic testing for this reason of the left lower extremity.

(Tr. 1129).

In November, the plaintiff received an MRI of her lumbar spine and an electrodiagnostic study. The MRI taken on November 14, 2022 indicated that the "right central L5-S1 disc extrusion [was] larger than in June."[10] (Tr. 1119).

On November 28, 2022, Dr. Tinklepaugh did an electrodiagnostic study and noted the following findings:

> The study is abnormal.
>
> There is electrodiagnostic evidence for mild, bilateral ulnar neuropathies at the across elbow segments consistent with the clinical diagnosis of cubital tunnel syndrome. Elbow pads worn nightly to bed were recommended.
>
> There is no electrodiagnostic evidence for a large fiber polyneuropathy nor for a radiculopathy of the left lower extremity. Electrodiagnostic testing does not evaluate small fiber nerve function.

(Tr. 1116–17).

On January 27, 2023, the plaintiff visited her primary care provider, Patrick Cullen, P.A., complaining of urinary incontinence. (Tr. 1383). During this appointment, she also complained about worsening back pain. (*Id.*).

The plaintiff returned to Dr. Tinklepaugh on February 23, 2023. (Tr. 1420–29). At this follow-up visit, the plaintiff complained that her right leg was weaker and that she continued to have "low back pain and radiating pain to the right leg." (Tr. 1421). After performing an examination, Dr. Tinklepaugh wrote:

[10] The findings were normal except for the following: "A moderate-sized right paracentral disc extrusion extending distally from the L5-S1 level is somewhat larger than on the June MRI. There is contact with the right S1 nerve root, and the dorsal displacement of the thecal sac, without significant central or foraminal stenosis. Disc height is maintained. Hyperintense signal within the extrusion indicative of edema." (*Id.*).

> I reviewed the MRI with the patient today she does have a significant central L5-S1 disc herniation fluid signal inside the herniated portion suggest that this is still somewhat unstable and it has progressed since imaging done in June. She has very mild foot dorsiflexion weakness and interestingly, the toe portion of her right shoe is worn through the sole to the foot that inside the shoe suggesting she does have some right foot dorsiflexion weakness. We will start her on some physical therapy and see if we can help both with the strength and also with her balance.
>
> I told her she is limited as to lifting activity, I do not want her lifting, pushing or pulling any significant weight that could exacerbate her disc herniation. We also discussed symptoms including but not limited to weakness or changes in bowel bladder function and pain that should alert her to call our office. As long as she is managed conservatively I do not think further intervention is needed no pain management or surgical evaluation indicated at this time.

(Tr. 1429).

### D. Medical Opinion Evidence

Four state agency reviewers evaluated the plaintiff's medical records. At the initial stage, Jeff Zhang, M.D., evaluated the plaintiff's physical limitations, and Christopher Leveille, Ph.D., evaluated her mental limitations. (Tr. 161–72). At the reconsideration stage, Prianka Gerrish, M.D., evaluated the plaintiff's physical limitations, and Michelle Nitto Leveille, Psy.D., evaluated her mental limitations. (Tr. 175–91).

The record contains two additional medical opinions.[11] Consultative examiner Liese Franklin-Zitzkat, Psy.D., evaluated the plaintiff on September 29, 2022. (Tr. 1026–31). The plaintiff's therapist, Jodi Anderson, L.M.F.T., also completed a mental health questionnaire on January 12, 2023. (Tr. 1246–48). David Boxwell performed a consultative examination on the plaintiff, but this evidence was struck from the record because Dr. Boxwell was subsequently "barred from participating in Federal programs due to a licensure issue." (Tr. 19, 1023).

[11] The parties dispute whether Dr. Tinklepaugh's assessment of the plaintiff on February 23, 2023, constitutes a medical opinion. (Tr. 1429 ("I told her she is limited as to lifting activity, I do not want her lifting, pushing or pulling any significant weight that could exacerbate her disc herniation."). This assessment was included in the section of this decision detailing the medical evidence, *supra* at 16–17.

**1. Initial Stage**

Dr. Zhang considered the plaintiff's physical health at the initial stage. Dr. Zhang summarized the plaintiff's relevant medical evidence for her back and fibromyalgia as including records from the Pequot Health Center in 2012 and 2013; Yale New Haven from 2016 through 2020; Dr. McKnight on September 21, 2021; the Bone and Joint Institute on January 31, 2022; and Dr. Boxwell's consultative examination from May 12, 2022, which was subsequently struck from the record due to a licensure issue. (Tr. 19, 164). Dr. Zhang determined that the plaintiff's only severe medically determinable physical impairments were those falling in the category of "Osteoarthrosis and Allied Disorders." (Tr. 166). With respect to the RFC, Dr. Zhang determined that the plaintiff had the following postural limitations: lift and/or carry twenty pounds occasionally and ten pounds frequently; push and/or pull with upper and lower extremities without any limitation; stand and/or walk with normal breaks for four hours in an eight-hour workday; sit with normal breaks for six hours in an eight-hour workday; balance without any limitations; climb ramps and stairs frequently but never climb ladders, ropes or scaffolds; crawl frequently; and stoop, kneel, and crouch occasionally. (Tr. 167–68). Dr. Zhang cited the plaintiff's "chronic low back pain and [ ] obesity" as the reasons for these postural limitations. (Tr. 168). Dr. Zhang also concluded the plaintiff did have some environmental limitations insofar as she should avoid concentrated exposure to vibration and moderate exposure to hazards. (*Id.*). In contrast, he concluded that the plaintiff did not have any visual, manipulative, or communicative limitations. (*Id.*).

Also at the initial stage, Dr. Leveille considered the plaintiff's mental health. Dr. Leveille summarized the relevant medical evidence as including records from Yale New Haven Health from April 17 through 19, 2017 and November 5, 2020; Dr. Boxwell's consultative examination

from May 12, 2022; and Dr. Franklin-Zitzkat's consultative examination from September 29, 2022. (Tr. 164). Dr. Leveille determined that the plaintiff's severe medically determinable mental impairments fell within three categories: "Anxiety and Obsessive-Compulsive Disorders"; Depressive, Bipolar and Related Disorders"; and "Trauma- and Stressor-Related Disorders." (Tr. 166). With respect to the RFC, Dr. Leveille determined that the plaintiff did not have any limitations with her understanding and memory, but she did have limitations with concentration and persistence, social interactions, and adaptation. (Tr. 169–70).

For sustained concentration and persistence limitations, Dr. Leveille determined that the plaintiff was moderately limited in her abilities to "maintain attention for extended periods"; "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances"; "complete a normal workday and workweek without interruptions from psychologically based symptoms" and "perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. 169). She was "not significantly limited" with all other metrics. (*Id.*). Dr. Leveille explained,

> The claimant has the ability to remember locations, work-like procedures and to understand, remember and carry out at least simple instructions. She can maintain a regular work schedule, sustain concentration and attention for 2-hour periods and perform at a reasonable pace. Claimant does not require special supervision and can make appropriate, work related judgments.

(*Id.*).

For social interaction limitations, Dr. Leveille determined that the plaintiff was moderately limited in her ability to "interact appropriately with the general public" and "get along with coworkers or peers without distracting them or exhibiting behavioral extremes," but was "not significantly limited" in all other metrics. (Tr. 170). Dr. Leveille explained,

> The claimant demonstrates appropriate interpersonal conduct, yet anxiety sxs may compromise sustained social fx. She would thus have difficulty interacting

> extensively with the general public and is better suited for tasks requiring little collaboration or teamwork. She will be able to relate adequately with coworkers and supervisors for task purposes.

(Tr. 170).

For adaptive limitations, Dr. Leveille determined that the plaintiff was moderately limited in her ability to "respond appropriately to changes in the work setting," but was "not significantly limited" in all other metrics. (*Id.*). He explained, "She can adapt appropriately to basic changes in the work atmosphere, although frequent and major changes may cause difficulty. Stress tolerance is reduced, yet remains adequate for a stable and predictable work environment. She maintains an ability to travel and avoid normal hazards." (*Id.*).

### 2. Reconsideration Stage

At the reconsideration stage, the state agency reviewers evaluated the evidence available at the initial stage along with additional evidence from Dr. McKnight, the Bone and Joint Institute, and the Pequot Health Center, as well as new evidence from Midstate Radiology Associates, Dr. Tinklepaugh, Community Health Center, and Lawrence & Memorial Hospital. (Tr. 177). The reconsideration report indicated that Dr. Boxwell's consultative examination had been stricken from the record (due to a licensure issue). (Tr. 19, 180).

Dr. Gerrish evaluated the plaintiff's physical limitations. Dr. Gerrish added several medical records to the medical records summary, including MRIs from June 17 and November 14, 2022; a record from Community Health Center from September 27, 2022; a neurological assessment from October 20, 2022; and an EMG assessment from November 28, 2022. (Tr. 180–81). Like Dr. Zhang, Dr. Gerrish concluded that the plaintiff's only severe medically determinable physical impairments were those falling in the category of "Osteoarthrosis and Allied Disorders." (Tr. 184). She also gave the plaintiff the exact same postural and environmental limitations, and

she found that the plaintiff did not have manipulative, visual, or communicative limitations. (Tr. 184–85).

Dr. Nitto Leveille evaluated the plaintiff's mental limitations and arrived at the exact same conclusions as Dr. Leveille at the initial stage. Namely, she determined that the plaintiff's mental impairments qualifying as "severe" fell into categories of "Anxiety and Obsessive-Compulsive Disorders"; "Depressive, Bipolar and Related Disorders"; and "Trauma- and Stressor-Related Disorders." (Tr. 182). She also gave the plaintiff the exact same limitations for sustained concentration and persistence, social interaction, and adaptation. (Tr. 188–89). To support her reasoning for these limitations, Dr. Nitto Leveille copied and pasted Dr. Leveille's explanations. (*Id.*). Lastly, Dr. Nitto Leveille determined the plaintiff did not have any limitations with understanding and memory.

**3. Consultative Examination**

On September 29, 2022, Dr. Franklin-Zitzkat conducted an in-person consultative examination as to the plaintiff's psychological functioning and/or impairments. (Tr. 1026–30). Dr. Franklin-Zitzkat observed that the plaintiff walked with a cane, had a polite demeanor, and "kept her arms crossed and bounced her right leg up and down nervously throughout the interview." (Tr. 1026). When asked about her chief complaints, the plaintiff discussed her history of panic attacks and her fear of having a panic attack in public, her depression, her tendency to stay in bed all day once or twice a week, her insomnia at night and tiring during the day, her increase in appetite at night, her difficulty concentrating and remembering things, and her feelings of worthlessness and suicidal thoughts. (Tr. 127).

The plaintiff also described her daily activities. (Tr. 1028). Her daily routine included getting her children on the bus, getting back into bed, watching the news, getting her children off

the bus, taking them to afterschool programs, cooking a simple meal for her children (unless her son cooked), and going to bed. (*Id.*). The plaintiff experienced physical difficulties cleaning, and she neglected to shower when severely depressed. (*Id.*). She did the laundry at her aunt's house because she needed help lifting, and there were too many people at the laundromat. She also went grocery shopping at the same store, with limited exceptions, and always went with her aunt. (*Id.*). She did not socialize. (*Id.*).

During the mental status examination, Dr. Franklin-Zitzkat observed that the plaintiff was polite, cooperative, had normal speech, "was not deemed to be at imminent risk of harm to self or others," and had a "logical and goal-directed" thought process. (*Id.*). However, her eye contact fluctuated, she had a "depressed and situationally anxious" mood and had an anxious affect. (*Id.*).

After performing various tests, Dr. Franklin-Zitzkat concluded that the plaintiff had "mildly impaired" concentration, unimpaired short- and long-term memory, average intellectual functioning, and good insight and judgment. (Tr. 1028–29). Dr. Franklin-Zitzkat's provisional diagnoses included panic disorder, agoraphobia, PTSD, and unspecified depressive disorder. (Tr. 1029).

Based on this medical examination, Dr. Franklin-Zitzkat issued the following medical source statement:

> [The plaintiff] would likely have mild difficulty attending to instructions. She seems capable of understanding and remembering instructions. She would likely have mild difficulty concentrating on tasks. Her anxiety would be evident to others and moderately impact interpersonal interactions in a work setting. Anxiety could interfere with her ability to maintain attendance and withstand work stresses and pressures; she attended today's appointment but needed her aunt with her. She should be able to adapt to simple changes insofar as the aforementioned problems do not interfere. She seems capable of making work-related decisions.

(*Id.*).

**4. Treating Provider**

In addition to the non-treating medical opinions, the evidence contains two medical opinions from the plaintiff's therapist, Ms. Anderson. (Tr. 1246–48, 1431–34).

On January 12, 2023, Ms. Anderson completed a questionnaire for the Disability Determination Service ("DDS"), explaining that the plaintiff had been a patient at Community Health Center since September 14, 2014 and that she received weekly/biweekly individual therapy and monthly medication management for her diagnoses of PTSD, depression and agoraphobia. (Tr. 1246).

The questionnaire prompted Ms. Anderson to provide her opinions about the plaintiff's ability to perform various tasks. Although Ms. Anderson stated that the plaintiff's ability to follow work rules was "fair," her ability to perform all other work tasks was "poor."[12] (Tr. 1247). Ms. Anderson opined, "The following symptoms exhibited by client will make it difficult for her to use sound judgement, handl[e] stress[,] [and] interact[] and relat[e] with others: persistent and exaggerated negative beliefs, persistent negative emotional state, distress and intrusive thoughts, fear of being outside of the home alone, intense fear of being [in] enclosed spaces alon[e], fear of not being able to escape, diminished interest in [activities], [and] increase[d] . . . anxiety in any type of social interaction." (*Id.*).

Ms. Anderson also indicated the plaintiff would have a "poor" ability to remember and carry out simple, complex or detailed job instructions. (*Id.*). She explained that the plaintiff's symptoms from PTSD and depression caused "intrusive distressing memories, difficulty sleeping,

[12] Ms. Anderson marked "poor" for the plaintiff's ability to "Relate to co-workers," "Deal with the public," "Use judgement," "Interact with supervisors," "Deal with work stresses," "Function independently," and "Maintain attention/concentration." (*Id.*).

and difficulty concentrating," which would limit her ability to "comprehend and follow simple and complex job instructions consistently." (*Id.*).

Ms. Anderson further noted the plaintiff would have a "poor" ability to maintain her appearance, behave with emotional stability, relate predictably in social situations, and be reliable. (*Id.*). Ms. Anderson opined that the plaintiff's agoraphobia, PTSD, and depression caused her to have "difficulty leaving the home without immediate family, [be] low functioning around completing her ADL's to maintain personal appearances, [and] avoid[]. . . people, places and things due to unrealistic fear of embarrassment and/or possible harm." (*Id.*).

Lastly, Ms. Anderson opined on non-work-related limitations. She confirmed that the plaintiff struggled to complete tasks, chores, and leisure activities because she had "difficulty concentrating," was not motivated and frequently overslept. (Tr. 1248). She also explained that the plaintiff struggled to relate to others due to her "intense fear of being judged" and "fear of embarrassment and entrapment." (*Id.*).

Ms. Anderson concluded, "Client often expresses she would like to work and be 'normal,' but due to client's symptoms related to PTSD, Agoraphobia, and depression, it will be difficult for client to sustain work." (*Id.*).

On February 8, 2023, Ms. Anderson completed a Department of Social Services Medical Report for Incapacity regarding her diagnoses of PTSD, depression, and agoraphobia. (Tr. 1432). Ms. Anderson indicated she had treated the plaintiff 66 times in the past two years and nine months. (Tr. 1433). She described the plaintiff's symptoms as "low motivation, PTSD symptoms, difficulty concentrating, panic attacks, agoraphobia, and difficulty completing ADLs." (*Id.*). Ms. Anderson determined the plaintiff's prognosis was "poor," and her limitations would incapacitate her ability to work. (*Id.*).

## III. THE ALJ'S DECISION

The ALJ must follow a five-step evaluation process as promulgated by the Commissioner to determine whether a claimant is disabled within the meaning of the Act. *See* 20 C.F.R. § 416.920(a).[13] At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since the application date of February 8, 2022. (Tr. 21).

At step two, the ALJ determined that the plaintiff had the following severe impairments: "obesity, lumbar degenerative disc disease, an adjustment disorder, post-traumatic stress disorder, and a depressive disorder." (Tr. 22). In addition to the severe impairments, the ALJ found the plaintiff had non-severe impairments of "asthma, fibromyalgia, bilateral neuropathy, carpal tunnel syndrome, restless leg syndrome, ulnar neuropathy, chronic pain, insomnia and chronic headaches and additional mental impairments of 'high anxiety,' [and] agoraphobia." (*Id.*).

At step three, the ALJ found that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 25). In doing so, the ALJ compared her impairments to various Listings. *See* 20 C.F.R. part 404,

---

[13] An ALJ determines a claimant's disability using a five-step analysis. *See* 20 C.F.R. § 416.920. First, an ALJ must determine whether a claimant is currently working. *See* 20 C.F.R. § 416.920(a)(4)(i). If a claimant is currently employed, then the claim is denied. *Id.* If a claimant is not working, then an ALJ must make a finding as to the existence of a severe mental or physical impairment. If none exists, then the claim is also denied. *See* 20 C.F.R. § 416.920(a)(4)(ii). If a claimant is found to have a severe impairment, then the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations ("the Listings"). *See* 20 C.F.R. § 416.920(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998). If a claimant's impairment meets or equals one of the impairments in the Listings, then the claimant is automatically considered disabled. *See* 20 C.F.R. § 416.920(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If a claimant's impairment does not meet or equal one of the listed impairments, then the claimant must show at the fourth step that she cannot perform her former work. *See* 20 C.F.R. § 416.920(a)(4)(iv). If a claimant shows that she cannot perform her former work, then the burden shifts to the Commissioner to show at step five that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if she shows that she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 416.920(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

Subpart P, Appendix 1. First, the ALJ compared the plaintiff's lumbar degenerative disc disease to Listings 1.15 and 1.16, "disorders of the skeletal spine resulting in a compromise of a nerve root" and "lumbar spinal stenosis resulting in compromise of the cauda equine," respectively. (Tr. 25). Second, the ALJ noted that obesity does not have a specific, comparable Listing. (Tr. 26). Third, the ALJ compared the plaintiff's mental health impairments to Listings 12.04 and 12.15, "depressive, bipolar or related disorders" and "trauma- and stressor-related disorders," respectively. (Tr. 26–27).

Next, the ALJ formulated the plaintiff's RFC. A plaintiff's RFC is the most they can do despite their impairments and is determined by assessing all the relevant evidence. 20 C.F.R. §416.945(a)(1). The ALJ determined the plaintiff had the RFC to perform "light work" with additional restrictions. (Tr. 27–28). With respect to movement, the plaintiff "can stand or walk with normal breaks for a total of four hours in an eight-hour workday"; "needs to be able to use a cane for ambulation"; "can frequently climb ramps or stairs and crawl"; "can occasionally stoop, kneel, and crouch"; and "can never climb ladders, ropes, or scaffolds." (*Id.*). With respect to environmental exposures, the plaintiff "must avoid concentrated exposure to vibration" and must "avoid all exposure to hazards such as proximity to moving mechanical parts, exposure to electrical shock, working in high exposed places, exposure to radiation, or working with explosives. . . ." (*Id.*). With respect to the type of work, the plaintiff "can perform simple work for two-hour periods that has only occasional interaction with the general public, does not require collaboration or teamwork with others, and has no more than occasional simple types of changes in a routine work setting." (Tr. 28).

At step four, based on the testimony of the vocational expert, the ALJ found that the plaintiff could not perform her past relevant work. (Tr. 37). The ALJ explained that "past *relevant*

work" was "work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 5 years or 5 years prior to the date that disability must be established." (*Id.*). The ALJ found that the plaintiff's past work of phone operator and shop attendant did not qualify as past *relevant* work because she did not perform these jobs within five years of February 8, 2022, the date on which she had to establish disability. (*Id.*).

Moving on to step five, the ALJ determined that the plaintiff could perform other jobs in the national economy, such as "office helper" and "inspector / hand packer," unskilled jobs performed at the "light" exertional level. (Tr. 38). Given this finding, the ALJ concluded that the plaintiff was not disabled. (*Id.*).

## IV. STANDARD OF REVIEW

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). The Court's function is to first ascertain whether the ALJ applied the correct legal principles in reaching their conclusion, and then whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g). *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012). Substantial evidence means more than a scintilla, "[i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 400 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 229 (1938)). Therefore, absent legal error, this court may not set aside the decision of the Commissioner if it is supported by substantial evidence. *Berry v. Schweiker*, 675

F.2d 464, 467 (2d Cir. 1982). "Such a deferential standard, however, is not applied to the Commissioner's conclusions of law." *Muntz v. Astrue*, 540 F. Supp. 2d 411, 418 (W.D.N.Y. Mar. 17, 2008) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)). "This court must independently determine if the Commissioner's decision applied the correct legal standards in determining that the plaintiff was not disabled." *Id*. "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson*, 817 F.2d at 986.

## V. DISCUSSION

The plaintiff argues that this case should be remanded because the ALJ's RFC determination is not supported by substantial evidence. The plaintiff's legal analysis is not organized into sub-arguments, but the plaintiff appears to be making four specific points to support her position. First, the plaintiff contends that the ALJ improperly determined that the medical opinions of Drs. Zhang and Gerrish were persuasive, because the medical evidence was incomplete, and they failed to consider a February 23, 2023 report from Dr. Tinklepaugh. (Doc. No. 21-1 at 14–15). Second, the plaintiff asserts that the ALJ "fashion[ed] the RFC on his own," as evidenced by statements he made during the hearing "curtail[ing]" the plaintiff's testimony, and committed reversible error when he failed to consider Dr. Tinklepaugh's medical opinion from February 23, 2023. (*Id.* at 16–17). Third, the plaintiff states that the substantial evidence supports an RFC with an upper extremity limitation and that the ALJ reversibly erred by failing to explain why he did not assign one. (*Id.* at 17–19). Fourth, the plaintiff argues that the ALJ failed to include anxiety as a severe impairment and that this failure constituted reversible error. (*Id.* at 19). For

these reasons, the plaintiff "submits that the ALJ's unfavorable decision misapplied the law and was not supported by substantial evidence." (Doc. No. 21-1 at 20).

The Commissioner maintains that the ALJ's RFC determination was based on substantial evidence. (Doc. No. 26). In so doing, the Commissioner points to the evidence that the ALJ found persuasive, including the medical opinions of Drs. Zhang, Gerrish, Leveille, and Nitto Leveille; the plaintiff's testimony about her ability to perform daily activities; and the plaintiff's conservative treatment for pain, asthma, and mental impairments. (*Id.* at 7–10). Second, the Commissioner argues that the plaintiff fails to demonstrate that the evidence required a more restrictive RFC. (*Id.* at 10–15). Within this argument, the Commissioner maintains that the ALJ did not commit reversible error when he determined that the opinions of Drs. Zhang and Gerrish were persuasive; that the evidence did not require an upper extremity limitation; and that the plaintiff's anxiety was properly considered in the context of her PTSD. (*Id.*). Finally, the Commissioner argues that the ALJ's statements during the hearing were not improper and were appropriately focused on asking about the plaintiff's limitations and that the ALJ's purported failure to define anxiety as a severe impairment was of no moment both because of the impairments he did designate as severe and the fact that the RFC incorporated the plaintiff's mental limitations. (*Id.* at 16–17).

For the following reasons, the Court finds that the ALJ's RFC determination was supported by substantial evidence and that his decision should be affirmed.[14]

**A. <u>Dr. Tinklepaugh's Treatment Record</u>**

The parties dispute whether Dr. Tinklepaugh's report from February 23, 2023, constituted a "medical opinion" under 20 C.F.R. 416.913. The plaintiff appears to assume that the report was

[14] Because the parties organize the key issues in significantly different ways, the Court addresses them in the order that it has determined is the clearest for this appeal.

a medical opinion and faults the ALJ for failing to craft an RFC which reflected the opinion. (Doc. No. 21-1 at 17). A "medical opinion" is defined as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions," including, in relevant part, a plaintiff's "ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching)." 20 C.F.R. § 416.913(a)(2)(i).

Prior to March 27, 2017, the definition of "medical opinion" was broader. Specifically, "medical opinions" were defined as "statement from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(1). Congress narrowed the definition of "medical opinion" in 2017. Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5849–50 (Jan. 18, 2017). The new definition removed "symptoms, diagnosis and prognosis" to focus instead on what the plaintiff "can still do despite [her] impairment," considering limitations and restrictions. *See* 20 C.F.R. § 416.913(a)(2). In proposing this rule change, Congress explained that "a narrower definition of medical opinions would improve our adjudicative process" insofar as "[a] more appropriate focus of medical opinions would be perspectives from medical sources about claimants' functional abilities and limitations." Proposed Revisions to Rules Regarding the Evaluation of Medical Evidence, 2016 WL 4702272, 81 Fed. Reg. 62560-01, at 62562 (Sept. 9, 2016). During the rulemaking process, a commenter "expressed concern that most medical sources, unless prompted to fill out a functional questionnaire, do not specifically address functional abilities and limitations in their notes; rather,

medical sources normally include symptoms, diagnoses, and prognoses." Revisions to Rules, 2017 WL 168819, 82 Fed. Reg. 5844, at 5849–50. The agency nonetheless adopted the proposed revision, explaining that "[d]iagnoses and prognoses do not describe how an individual functions." *Id.*

Based on the revised 2017 definition of "medical opinion," the Court concludes that Dr. Tinklepaugh's record from February 23, 2023, does not constitute such an opinion. On February 23, 2023, Dr. Tinklepaugh performed a physical examination and noted the following:

- **General Exam**: In no acute distress, pleasant and normally interactive. Follows directions normally. Speech and language function are normal.
- **Cranial nerves**: Extraocular movements intact
- **Motor**: to resistance she has excellent strength and tone is normal, no evident bulk loss.
- **Sensory**: **10g mono**-patchy sensory loss in the left lower extremity along the anterolateral distal thigh and proximal anterior shin, some patchy changes in the thighs bilaterally. Normal in the feet and hands as well as upper extremities

  **Temp-**intact in the feet and hands

  **Vib-**normal extinction
- **Reflexes**: 2+ with the exception of the left patella reflex which is absent, toes are down
- **Abnormal movement**: none
- **Coordination & Gait**: gait is wide-based she appears to have difficulty with balance but walking without an assistive device

(Tr. 1424) (emphasis in original).[15] Dr. Tinklepaugh added: "mild right foot dorsiflexion and foot inversion weakness 5 -/5, eversion is normal as is strength testing in the remaining right and left lower extremities. She is walking with a cane." (*Id.*).

In the Assessment and Plan, Dr. Tinklepaugh wrote that the plaintiff had "a significant central L5-S1 disc herniation fluid signal" and that she had "very mild foot dorsiflexion weakness."

[15] This information appears in the record as a chart.

(Tr. 1429). He recommended physical therapy to help "strength and also with her balance." (*Id.*). Dr. Tinklepaugh wrote: "I told her she is limited as to lifting activity, I do not want her lifting, pushing or pulling any significant weight that could exacerbate her disc herniation." (*Id.*). Dr. Tinklepaugh did not clarify what he meant by "significant weight." Dr. Tinklepaugh's notes from February 23, 2023, do not otherwise explain what the plaintiff *can still do* despite her limitations. 20 C.F.R. § 416.913(a)(2). Indeed, he did not specify how much she could lift, push, or pull.

The Court finds that Dr. Tinklepaugh's assessment is better classified as "other medical evidence" rather than as a "medical opinion." *See, e.g., Kathleen M. v. Comm'r of Soc. Sec.*, No. 8:20-cv-1040(TWD), 2022 WL 92467, at *7 (N.D.N.Y. Jan. 10, 2022) ("Although Dr. Asar's October 1, 2019, letter presents a close call, it is not a 'medical opinion' under 20 C.F.R. § 404.1513(a)(2) because it does not address what Plaintiff could still do despite her impairments."); *Michael H. v. Saul*, No. 5:20-cv-417(MAD), 2021 WL 2358257, at * (N.D.N.Y. June 9, 2021) ("This note presents a close call on what is considered a medical source statement. While it discusses Plaintiff's limitations, it does not discuss what Plaintiff is still capable of doing. . . . [U]nder the new regulations, a medical source opinion must do both."); *Jessica Lynn J. v. Comm'r of Soc. Sec.*, 645 F. Supp. 3d 128, 135 (W.D.N.Y. 2022) (finding the provider's statement that the plaintiff's "symptoms would exacerbate and she would be capable of less than a sedentary level of work" were "not meaningful statements regarding the impact that Plaintiff's impairments would have on her ability to perform work-related functions."); *c.f. Alicia B. v. Kijakazi*, 2025 WL 2779039, at *4 (D. Conn. Sept. 30, 2025) (finding the provider's report was not a medical opinion because it contained "information about the Plaintiff's gait and motor strength, but does not offer any opinion as to the claimant's ability to perform work-related activities.") (internal quotations marks removed).

Furthermore, regardless of whether the ALJ should have explicitly treated the February 23, 2023 report as a medical opinion, the Court agrees with the defendant that the ALJ considered Dr. Tinklepaugh's limitations in his RFC. The ALJ explicitly referenced these restrictions when summarizing Dr. Tinklepaugh's records. (*See* Tr. 30–31). When formulating the RFC, the ALJ restricted the plaintiff to "light work," which is defined as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," and, in relevant part, "sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 416.967(b). Accordingly, while the ALJ did not include a push-pull restriction, he incorporated Dr. Tinklepaugh's lifting restrictions into his RFC.

**B. <u>Persuasiveness of State Agency Reviewers</u>**

The plaintiff argues that the ALJ erred by determining that the opinions of Drs. Zhang and Gerrish were persuasive.[16] (Doc. No. 21-1 at 14–16). The plaintiff states that Dr. Zhang "inappropriately considered" Dr. Boxwell's consultative examination since it was later excluded from the record.[17] (*Id.* at 16). And though the plaintiff acknowledges that Dr. Gerrish did not review Dr. Boxwell's examination because it had been removed before the reconsideration stage, she claims that Dr. Gerrish erred by failing to consider Dr. Tinklepaugh's record from February 23, 2023. (*Id.* at 15). According to the plaintiff, "The ALJ erred by finding the state agency reports

---

[16] Section 416.910c of Title 20 of the Code of Federal Regulations sets forth the parameters an ALJ must follow when evaluating the persuasiveness of a medical opinion or prior administrative medical finding. The Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 416.910c(a). Instead, the ALJ evaluates the medical opinions by applying the five factors listed in 20 C.F.R. § 416.910c(c): (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) any other factors, including whether new evidence received after the medical opinion was completed would make that medical opinion "more or less persuasive." 20 C.F.R. § 416.910c(c)(1)–(c)(5). The plaintiff does not challenge the ALJ's evaluation of these five factors.

[17] The plaintiff fails to mention that Dr. Boxwell's examination was properly excluded *after* Dr. Zhang's report due to a licensure issue. (Tr. 19).

to be persuasive because they were based upon incomplete medical evidence, and also by failing to properly evaluate Dr. Tinklepaugh's opinion on the plaintiff's functional limitations in violation of 20 CFR § 416.920c." (*Id.* (internal citation removed)).

The defendant maintains that the ALJ did not err for three reasons. First, the defendant contends that there is no requirement that the medical opinions of Drs. Zhang and Gerrish be based on a complete record as long as they are reliable. (Doc. No. 26-1 at 11). Second, the defendant maintains that the ALJ properly considered Dr. Tinklepaugh's lifting restriction from the February 23, 2023 report, when he evaluated the persuasiveness of Drs. Zhang's and Gerrish's medical opinions. (*Id.* at 13). Third, the defendant argues that Dr. Tinklepaugh's treatment note from February 23, 2023 does not constitute a medical opinion, and the ALJ was not required to analyze it as such. (*Id.* 13–14).

As an initial matter, a medical opinion need not be based on the entire record, so long as "treatment notes and opinions in the record before and after the opinion was issued demonstrate substantially similar limitations and findings." *Sonia N.B.A. v. Kijakazi*, No. 3:21-CV-00709-TOF, 2022 WL 2827640, at *5 (D. Conn. July 20, 2022). A medical opinion becomes stale "when the opinion can no longer be relied upon because subsequent evidence that the source could not have considered calls into question the reliability of the opinion." *James G. v. Comm'r of Soc. Sec.*, No. 1:20-cv-1885-DB, 2022 WL 2180158, at * 10 (W.D.N.Y. June 16, 2022); *see Rosario R. v. Bisignano*, No. 3:24-CV-1445 (VDO), 2025 WL 2300764, at *4 (D. Conn. Aug. 9, 2025) (explaining that a stale opinion is one that is "rendered before some significant development in the claimant's medical history," such as a "deteriorating condition" or surgery).

The plaintiff is correct that Dr. Zhang's medical opinion considered Dr. Boxwell's excluded examination, and it predated the plaintiff's treatment by Dr. Chandrasekaran and Dr.

Tinklepaugh. However, Dr. Zhang relied on other objective medical evidence ranging from September 2013 through February 2022, including physical therapy notes, MRIs, X-Rays, EMGs, EEGs, and other medical sources' notes about the plaintiff's upper extremity pain, vision issues, and back pain. (Tr. 163–65). Dr. Zhang accounted for the plaintiff's medical history of chronic back pain by setting limitations for climbing, balancing, stooping, kneeling, crouching, and crawling. (Tr. 168). He also accounted for the plaintiff's upper extremity issues by limiting the plaintiff to occasionally lifting twenty pounds and frequently lifting ten pounds. (Tr. 167–68). As the Second Circuit recently explained in a summary order, "[T]here is no unqualified rule that a medical opinion is superseded by additional material in the record." *Jimenez v. Bisignano*, No. 25-2374, 2026 WL 2797686, at *4 (2d Cir. Sept. 18, 2026).

The subsequent medical evidence was largely consistent with the functional limitations that Dr. Zhang set. Dr. Chandrasekaran treated the plaintiff one time on January 31, 2022 and concluded that the plaintiff "appears to have myofascial pain disorder/central pain sensitization." (Tr. 1008). Her assessment did not suggest significant limitations insofar as she deferred medication management to the plaintiff's primary care provider and psychiatrist; informed the plaintiff about how to reduce pain from fibromyalgia, including with relaxation techniques and stress reduction programs, mood disorder treatment, good sleep, exercise, and acupuncture; and did not schedule follow-up appointments with her. (*Id.*). Similarly, Dr. Tinklepaugh opined that the plaintiff had symptoms "consistent with ongoing cubital tunnel syndrome" but only recommended that she wear elbow pads at night. (Tr. 1129). After the plaintiff received an EMG study in November 2022, Dr. Tinklepaugh found "mild, bilateral ulnar neuropathies at the across elbow segments." (Tr. 1116–17). In February 2023, he stated that the plaintiff had "significant central L5-S1 disc herniation fluid signal" and "very mild foot dorsiflexion weakness," which

would benefit from physical therapy." (Tr. 1429). Dr. Tinklepaugh indicated that the plaintiff should be "limited as to lifting activity," including "lifting, pushing, or pulling any significant weight that could exacerbate her disc herniation." (*Id.*). He concluded: "As long as she is managed conservatively I do not think further intervention is needed no pain management or surgical evaluation indicated at this time." (*Id.*). The Court finds these records are substantially similar to the medical evidence that Dr. Zhang did consider and, more importantly, that they are not inconsistent with the functional limitations that Dr. Zhang recommended.[18]

Turning to Dr. Gerrish, the Court also finds that her medical opinion was not stale. Dr. Gerrish issued an RFC identical to Dr. Zhang, setting limitations for climbing, balancing, stooping, kneeling, crouching, crawling, lifting and carrying but not for pushing, pulling, handling, or fingering. (Tr. 167–68, 184–85). Unlike Dr. Zhang, she had the benefit of the records from Dr. Chandrasekaran and from Dr. Tinklepaugh, with the exception of the February 2023 notes. Although Dr. Tinklepaugh suggested a lifting restriction in the February 2023 notes, these same notes generally support a finding that the plaintiff's back and upper extremity pain was not significant. (Tr. 1429) ("As long as she is managed conservatively I do not think further intervention is needed no pain management or surgical evaluation indicated at this time.").

Moreover, it bears emphasis that, though the ALJ found the RFC determinations by Drs. Zhang and Gerrish to be "persuasive with respect to all the specific exertional, postural and environmental functional limitations," he also found that the record supported an additional limitation to use a cane for ambulation. (Tr. 34–35).

[18] To the extent the plaintiff believes that the ALJ should have ordered a new consultative examination (though she fails to articulate this argument with any detail), "an ALJ is not required to order a consultative examination if the facts do not warrant or suggest the need for it." *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 32 (2d Cir. 2013); *Jimenez*, 2026 WL 2797686 (same).

To the extent the plaintiff believes that the ALJ "only partially credited the state agency opinions and proceeded to fashion the RFC on his own," (Doc. No. 21-1 at 16), the Court finds no error here. "An RFC finding is administrative in nature, not medical, and its determination is within the province of the ALJ," *Curry v. Comm'r of Soc. Sec.*, 855 F. App'x 46, 48 n.3 (2d Cir. 2021), so long as the ALJ does not substitute his judgment for a "competent medical opinion." *Quinto v. Berryhill*, No. 3:17-cv-00024 (JCH), 2017 WL 6017931, at *12 (D. Conn. Dec. 1, 2017); *see also Jimenez*, 2026 WL 2797686 ("An ALJ is entitled to weigh all of the evidence available to make an RFC finding that is consistent with the record as a whole, and its conclusion need not perfectly match any single medical opinion in the record.") (internal quotation marks omitted). The plaintiff has not presented the Court with any evidence that the ALJ substituted his judgment for any medical opinion. Instead, the plaintiff cites portions of the hearing in which the ALJ asked the plaintiff to testify about her functional limitations rather than her symptoms. The plaintiff seems to believe that the ALJ's comments reflect "his subjective view of what others may be able to tolerate." (Doc. No. 21-1 at 17). The Court notes that the plaintiff was represented by counsel during the hearing, and counsel could have asked questions to elicit testimony about her functional limitations. Indeed, the ALJ directed counsel to ask the plaintiff about her limitations, in an effort to elicit testimony relevant to the RFC. The plaintiff has not cited any legal authority suggesting that the ALJ's comments during the hearing were improper, somehow limited the plaintiff's testimony, or had any bearing on his RFC determination. Accordingly, the Court concludes the hearing testimony does not establish that the ALJ substituted his own judgment for a competent medical opinion.

**C. <u>Upper Extremity Limitation</u>**

The plaintiff also argues that the ALJ committed reversible error by failing to include "limitations on the use of the upper extremities, such as for pushing and pulling or handling and fingering." (Doc. No. 21-1 at 17). According to the plaintiff, the substantial evidence required an upper extremity limitation. (*Id.* at 17–19). The defendant maintains that the substantial evidence supported the ALJ's decision not to include an upper extremity limitation.

The Court agrees with the defendant. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 400. The Court has assessed the plaintiff's citation to three pieces of evidence that she believes support her position. In the Court's view, a "reasonable mind" could have evaluated this evidence and reached the same conclusion as the ALJ.

First, the plaintiff states that an EMG study from 2017 "confirmed ulnar neuropathy at the elbow," although she also acknowledges that an EMG study from July 2020 was normal. (*Id.* at 18). The EMG study from 2017 predates the onset date by two years, and the subsequent EMG conflicts with the earlier findings. Because the subsequent study supports the ALJ's RFC determination, the Court finds no error here.

Second, the plaintiff refers to Dr. Chandrasekaran's examination in which she "noted tender hand and finger joints, wrists, and elbows," along with lab work showing elevated inflammation. (*Id.*). The ALJ considered this evidence in formulating his RFC. (Tr. 29). While Dr. Chandrasekaran noted the plaintiff's symptoms and stated that she "appear[ed] to have myofascial pain disorder/central pain sensitization," Dr. Chandrasekaran did not schedule any follow-up appointments or otherwise provide the plaintiff with a plan of care. (Tr. 1008).

Third, the plaintiff cites to Dr. Tinklepaugh's reports and notes from October 2022 and February 23, 2023. (Doc. No. 21-1 at 18). As with Dr. Chandrasekaran, the ALJ considered Dr. Tinklepaugh's records as well and summarized them in detail. (Tr. 30).

With respect to the plaintiff's physical impairments, the ALJ summarized nearly all of the records, including the plaintiff's testimony, appointments with Dr. McKnight in September 2021 and October 2022, a rheumatology appointment with Dr. Chandrasekaran in January 2022, MRIs of her pelvis in June 2022 and back in November 2022, and appointments with Dr. Tinklepaugh in October 2022 and February 2023. (Tr. 29–30). The ALJ stated that the diagnostic testing showed "only mild lumbar degenerative changes with no evidence of stenosis or resulting radiculopathy" and found they were "consistent claimant's physical examination findings, which remain largely intact despite her reported symptoms." (Tr. 31). He also noted that the plaintiff received "minimal and conservative" treatment. (Tr. 1002–11, 1420–29). Based on this assessment, the ALJ restricted, to varying degrees, the plaintiff's standing, walking, sitting, climbing, stooping, kneeling, crouching, and exposure to hazards. (Tr. 27–28). He did not give any upper extremity restrictions, such as limitations on lifting, carrying, pushing, pulling, handling, or fingering. (*Id.*). The Court concludes that the ALJ's RFC determination was supported by substantial evidence. In particular, the functional limitations included in the RFC were supported by the evidence in the medical record, and the absence of any upper extremity limitation certainly did not conflict with the medical evidence.

### D. <u>Anxiety</u>

Finally, the plaintiff argues that "the ALJ erroneously found that anxiety was not a medically determinable impairment, and this further detracts from the sufficiency of the RFC determination." (Doc. No. 21-1 at 19). In making this argument, the plaintiff acknowledges that

the ALJ included an "adjustment disorder" as a severe impairment. (*Id.* at 20). The defendant contends that the ALJ "properly considered Plaintiff's anxiety in reaching the RFC" because he found it to be a symptom of her other severe mental impairments, including PTSD and depressive disorder. (Doc. No. 26-1 at 15).

In arguing that the ALJ did not properly consider her anxiety, the plaintiff cites the medical opinions from Dr. Franklin-Zitzkat, a consultative examiner, and her therapist, Ms. Anderson.[19] (Doc. No. 21-1 at 19).

Dr. Franklin-Zitzkat opined that the plaintiff's anxiety "would be evident to others and moderately impact interpersonal interactions in a work setting" and that it "could interfere with her ability to maintain attendance and withstand work stresses and pressures." (Tr. 1029). The ALJ concluded that her assessment of the plaintiff's anxiety was not supported by the record. (Tr. 36). The plaintiff does not challenge the ALJ's determination.

Ms. Anderson found that the plaintiff would struggle to use sound judgment, handle stress and interact with others due to her persistent negative beliefs and emotional state, her distress and intrusive thoughts, her fear of being outside and of being in enclosed spaces, and her social anxiety. (Tr. 1247). The ALJ concluded her opinion was "less persuasive" on the grounds that the degree of the plaintiff's functional limitations that Ms. Anderson suggested were consistent with or supported by the plaintiff's "longitudinal treatment records, including Ms. Anderson's own treatment notes"; the plaintiff's "level of treatment, which [ ] consisted solely of stable mental health treatment" without hospitalization; and the plaintiff's own reported activities, including those documented in treatment notes. (Tr. 36–37). As with Dr. Franklin-Zitzkat, the plaintiff does

[19] The plaintiff also cites a consultative examination from 2014. Pursuant to policy, the ALJ considered medical evidence for the twelve months preceding the plaintiff's SSI application date. (Tr. 19). This examination predated the onset date by five years so the ALJ did not consider it. (*Id.*). The plaintiff does not challenge this determination.

not challenge the ALJ's evaluation of Ms. Anderson's medical opinions and so the Court will not second-guess the ALJ's determination.

After evaluating the record, the Court agrees with the ALJ that the plaintiff's therapists did not list anxiety as a separate diagnosis. (Tr. 25). Rather, Ms. Anderson diagnosed the plaintiff with agoraphobia, PTSD, and major depressive disorder. (Tr. 1066–68, 1072–74, 1078–84, 1088, 1377–82, 1391–1412). Nurse Hunt and Ms. Hiralien diagnosed the plaintiff with PTSD and depression. (Tr. 1069–71, 1085–87, 1270–98, 1302–23, 1327–47, 1388–90). Ms. Rodriguez diagnosed the plaintiff with major depressive disorder and, eventually, PTSD. (Tr. 1351–69, 1370–72). To be sure, all of their treatment notes regularly include the plaintiff's complaints about anxiety. The ALJ acknowledged the plaintiff's complaints about anxiety in his summary of Community Health Center records, but he concluded that the records did "not objectively or clinically support the degree of symptomology or resulting functional limitations that the claimant has alleged in her statements and testimony." (Tr. 31–32).

Critically, in formulating the RFC, the ALJ accounted for the plaintiff's anxiety. Specifically, the ALJ limited the plaintiff to "only occasional interaction with the general public," no required "collaboration or teamwork with others," and "no more than occasional simple types of changes in a routine work setting." (Tr. 28). Having reviewed the medical opinions regarding the plaintiff's mental limitations and the medical evidence, the Court concludes that a "reasonable mind" would agree with the limitations crafted by the ALJ. *See Richardson*, 402 U.S. at 400. Accordingly, the Court finds that the ALJ's limitations are supported by substantial evidence.

Even if the ALJ's assessment that the plaintiff's anxiety was "non-severe" did constitute an error, that error would be harmless because the ALJ considered the plaintiff's anxiety in the RFC limitations. In explaining the RFC, the ALJ discussed evidence about the plaintiff's anxiety,

including her testimony, medical records from Community Health Center, and Dr. Franklin-Zitzkat's consultative examination. (Tr. 28, 31–33). The Second Circuit addressed a nearly identical circumstance in *Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013). In *Reices-Colon*, the ALJ did not include the plaintiff's anxiety and panic disorders as "severe impairments" but identified other severe impairments and proceeded to the subsequent steps where "the ALJ specifically considered her anxiety and panic attacks." *Id.* The Second Circuit held, "Because these conditions were considered during the subsequent steps, any error was harmless." *Id.* For the same reasons discussed in *Reices-Colon*, the Court finds that any step two error would be harmless here.

## VI. CONCLUSION

The plaintiff's motion for an order reversing or remanding the Commissioner's decision (Doc. No. 21) is **DENIED**, and the Commissioner's motion to affirm that decision (Doc. No. 26) is **GRANTED**. The Clerk is directed to enter judgment in favor of the Commissioner and close this case.

This is not a Recommended Ruling. The consent of the parties permits this Magistrate Judge to direct the entry of a judgment of the District Court in accordance with the Federal Rules of Civil Procedure. Appeals from this judgment can be made directly to the appropriate United States Court of Appeals. *See* 28 U.S.C. § 636(c)(3); Fed. R. Civ. P. 73(c).

It is so ordered this 29th day of September, 2026, at New Haven, Connecticut.

/s Robert M. Spector
Robert M. Spector,
United States Magistrate Judge